UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| MIDWEST TITLE LOANS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 1:07-cv-1479-SEB-DML |
| vs. | ) | |
| | ) | |
| JUDITH J. RIPLEY, In Her Official | ) | |
| Capacity as Director of the Indiana | ) | |
| Department of Financial Institutions, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY GRANTING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND PERMANENT INJUNCTION**

This cause is before the Court on Plaintiff Midwest Title Loans, Inc.'s ("Midwest

Title") Motion for Summary Judgment and Permanent Injunction [Docket No. 38], filed

on March 24, 2008; and Defendant Judith J. Ripley's cross motion for Summary

Judgment [Docket No. 42], filed on March 24, 2008.  Midwest Title brought its

complaint, pursuant to 42 U.S.C. § 1983, against Defendant, Judith J. Ripley, in her

official capacity as Director of the Indiana Department of Financial Institutions ("IDFI"),

seeking to enjoin Ms. Ripley from enforcing the Indiana Uniform Consumer Credit Code,

Ind. Code § 24-4.5-1-101 to 24-4.5-7-212 (the "IUCCC"), against Midwest Title.

Plaintiff filed its action following receipt of a cease-and-desist letter issued by the

Supervisor of the IDFT Consumer Credit Division charging Midwest Title with being in

violation of the IUCCC.  Plaintiff asserts that, under Seventh Circuit and Supreme Court

precedent, Defendant is forbidden by the Commerce Clause of the United States Constitution (Art. I, § 8) from applying the IUCCC extraterritorially to an Illinois business.[1]

For the reasons detailed below, Plaintiff's Motion for Summary Judgment and Permanent Injunction is <u>GRANTED</u>, and Defendant's Motion for Summary Judgment is <u>DENIED</u>.

### **Factual Background**

Plaintiff Midwest Title is an Illinois business corporation licensed by the Illinois Department of Financial Institutions as a consumer installment loan company.  Stip. at ¶ 1.  Defendant Judith Ripley is chief executive and administrative officer of the Indiana Department of Financial Institutions ("IDFI").  <u>Id.</u> at ¶ 3.

Plaintiff issues consumer loans, which are secured by the borrower's motor vehicle, and operates exclusively from 23 separate locations throughout the state of Illinois.  Plaintiff has no business locations within Indiana.  <u>Id.</u> at ¶¶ 1-2; 4.  Plaintiff does not own or lease property in Indiana and does not hold a certificate of authority or license to do business in Indiana.  <u>Id.</u> at ¶ 9.  The parties agree that no Midwest Title agent or employee solicits business *in person* in Indiana, and all reminder and collection calls to

---

[1] On March 24, 2008, the parties stipulated to the dismissal, with prejudice, of Count II of Plaintiff's Complaint [Docket No. 37]. That portion of the Complaint requested declaratory and injunctive relief and alleged that the IUCCC discriminated against "companies such as Plaintiff that are not affiliated with Indiana industrial loan and investment companies."  Compl. at ¶ 31. We accepted that stipulation in a signed Order entered on March 25, 2008 [Docket No. 44].

Indiana borrowers are made from Plaintiff's Illinois-based offices. Id. at ¶ 8. However, Plaintiff does solicit business from Indiana consumers via other means. See id. at ¶ 8.

The parties have stipulated to certain uncontested facts [see Docket No. 39 (Designation of Evidence in Support of Plaintiff's Motion for Summary Judgment, Pl.'s Exh. 1); Docket No. 43 (Designation of Evidence in Support of Defendant's Motion for Summary Judgment, Def.'s Exh. A)]. The following material facts are lifted from those stipulations or are otherwise undisputed:

Prior to August 2007, Midwest Title accepted in-person applications for loans from Indiana residents. To apply, an applicant drove his motor vehicle and certificate of title to one of Midwest Title's Illinois locations. If approved, the applicant executed the necessary loan documents at the Illinois location and provided Midwest Title with a set of keys to the vehicle to secure the loan.[2] Stip. at ¶ 8(a). Midwest Title would then submit the necessary documentation to the Indiana Bureau of Motor Vehicles to have its lien noted on the borrower's certificate of title. Id. at ¶ 8(f). Loan funds were disbursed in person to the borrower at the Illinois business location. Borrowers could make principal and interest payments at any Midwest Title location in Illinois. Payments were also accepted via money order or certified check transmitted through U.S. mail, by credit card, or through Western Union. Id. at ¶ 8(a), (g).

_____

[2]This enabled Midwest Title to engage in self-help repossession in the event of an uncured default by the borrower. Stip. at ¶ 8(a). On occasion, Plaintiff contracted with an unaffiliated third-party repossession company to repossess vehicles licensed in the state of Indiana. Prior to judicial sale, such vehicles were stored in Indiana and sold through an unaffiliated Indiana auction house. Id. at ¶ 8(h).

Plaintiff admits that it engaged in advertising and solicitation activities targeting Indiana customers.  Plaintiff made annual mailings to Indiana residents who had previously used its services, with the effect of soliciting repeat business from those customers.  Id. at ¶ 8(b).  Plaintiff further admits to advertising on television stations in Indianapolis and Terre Haute, Indiana, and on Chicago-based television and radio stations that reached Indiana residents.  Id. at ¶ 8(c).  In addition, Plaintiff was listed in the Yellow Pages telephone directory in some Indiana communities.  Id. at ¶ 8(d).

 In August 2007, Plaintiff received a letter from the IDFI informing the company of a recent amendment, the "Territorial Application Provision," to the IUCCC.  Stip. at ¶ 5, 10.  As amended, the IUCCC imposes Indiana licensing and regulatory requirements on lenders "who are soliciting by any means and then making consumer loans to Indiana residents . . . " IND. CODE § 24-4.5-1-201.  For purposes of the Territorial Application Provision, a sale, lease, or loan transaction occurs in Indiana "if a consumer who is a resident of Indiana enters into a sale, lease, or loan transaction with a creditor in another state *and the creditor has advertised or solicited sales, leases, or loans in Indiana* by any means, including by mail, brochure, telephone, print, radio, television, the Internet, or electronic means . . ."  IND. CODE § 24-4.5-1-201(d) (emphasis added).  The letter noted that if a creditor violates this provision, "the loan is void and the debtor is not obligated to pay either the principal or loan finance charge, as set forth in IC 24.4.5-5.202."[3]  IND.

---

[3] These provisions became effective on July 1, 2007.  Stip. at ¶ 10.

CODE § 24-4.5-1-201(8).  Finally, IDFI warned Plaintiff that "failure to comply with Indiana law concerning loans made to Indiana residents could subject your company to regulatory enforcement by the office of the Indiana Attorney General and raise possible civil claims by customers."  Stip. at ¶ 10.  The parties agree that while the letter does not explicitly say so, "it is the position of the Director that the IUCCC does not apply to a loan consummated in a face-to-face meeting outside Indiana unless the loan resulted from either a solicitation received by the borrower in Indiana or media advertising originating in Indiana."  Id. at ¶ 11.

Upon receipt of the warning letter, Plaintiff immediately suspended offering loans to Indiana residents.  Id. at ¶ 12.  Plaintiff also stopped charging and collecting interest on loans made to Indiana borrowers between July 1, 2007, and its receipt of the IUCCC letter, and refunded all previously made payments of interest on the covered loans.  Id. at ¶ 13.

Plaintiff extended a total of 2,054 loans to Indiana borrowers in 2006, which represented approximately 9 percent of Plaintiff's business.  Id. at ¶ 6, Pl.'s Br. in Supp. at 2.  The interest rate charged by Plaintiff exceeds the 36 percent per annum limit allowed by the IUCCC, Stip. at ¶ 4; therefore, the loans do not comply with Indiana law.

## Legal Analysis

### I.      Standard of Review

Summary judgment is appropriate when the record establishes that there is "no

5

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  <u>See id.</u> at 255. However, neither the "mere existence of some alleged factual dispute between the parties," <u>id.</u> at 247, nor the existence of "some metaphysical doubt as to the material facts," <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  <u>Michas v. Health Cost Controls of Illinois, Inc.</u>, 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex</u>, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof may discharge its burden by showing an absence of evidence to support the non-moving party's case.  <u>Id.</u> at 325.

When the issues presented are purely questions of law, as the case at bar, summary judgment standards nonetheless apply.  <u>See</u> <u>Oneida Tribe of Indians of Wisconsin v. State of Wisconsin</u>, 951 F.2d 757, 760 (7th Cir. 1991).  Courts are often confronted with

cross-motions for summary judgment because Rules 56(a) and (b) of the Federal Rules of Civil Procedure allow both plaintiffs and defendants to move for such relief.  "In such situations, courts must consider each party's motion individually to determine if that party has satisfied the summary judgment standard."  Kohl v. Ass'n. of Trial Lawyers of Am., 183 F.R.D. 475 (D.Md.1998).  While cross motions for summary judgment may lead to a judgment without trial, the standard for determining whether summary judgment should issue is unchanged from that which applies when only a single party has moved for the relief.

## II.    **Dormant Commerce Clause:**

The Territorial Application Provision of the IUCCC provides that Indiana law applies to any transaction in which "a consumer who is a resident of Indiana enters into a sale, lease, or loan transaction with a creditor in another state *and the creditor has advertised or solicited sales, leases, or loans in Indiana by any means*, including by mail, brochure, telephone, print, radio, television, the Internet, or electronic means . . ."  IND. CODE § 24-4.5-1-201(d) (emphasis added).  Plaintiff contends that this amendment violates the Commerce Clause of the United States Constitution by attempting to impose an extraterritorial regulation on commerce conducted lawfully in Illinois.  Compl. at 8-9. Plaintiff claims that, because Indiana is attempting to apply the IUCCC to contracts made wholly outside the state, the Territorial Application Provision is *per se* invalid.  Pl.'s Br. in Supp. at 8-15.  Plaintiff seeks both declaratory and injunctive relief.

Defendant rejoins that the Indiana statutory scheme is not triggered unless a lender affirmatively targets Indiana consumers by advertising or soliciting in Indiana, and that, because Plaintiff solicits business across state lines, the loans in question are not transacted "wholly" within Illinois.  Def.'s Br. in Supp. at 16.  Defendant argues that the purpose of the Territorial Application Provision is to "protect consumer buyers, lessees, and borrowers against unfair practices by some suppliers of consumer credit," and that a socially protective legislative purpose, as opposed to economic protectionism, is permissible, even if it imposes an incidental burden on interstate commerce.  Id. at 18.  Defendant further maintains that the facts stipulated by the parties "readily acknowledge a number of [Midwest Title's] activities which have a nexus with Indiana."  Id. at 8.  Specifically, Defendant asserts that by directing mailings to Indiana consumers, advertising on radio and television stations located in Indianapolis and Terre Haute, and paying to have its name listed in the Yellow Pages in Indiana, "Midwest Title has invoked Indiana's consumer protection laws."  Id. at 9.  Defendant thus urges us to apply the balancing test of Pike v. Brue Church, 397 U.S. 137 (1970), to Plaintiff's Dormant Commerce Clause challenge and uphold the Territorial Application Provision of the IUCCC.

The United States Constitution allocates to Congress the power to "regulate Commerce . . . among the several States."  U.S. Const. Art I, § 8.  Implicit in Congress's exclusive authority over interstate commerce is a restriction on states from doing the same.  See New Energy Co. of Ind. v. Limbach, 486 U.S. 269, 273 (1988).  This

8

occurring in its sister states.").  The parties' dispute, appropriately framed, is whether the

loans offered by Midwest Title constitute commerce "wholly outside" the state of

Indiana, thus implicating the Dormant Commerce Clause.[4]

In support of its argument, Plaintiff cites <u>Dean Foods</u>, stating that "Indiana's

aggressive effort to assert the IUCCC extraterritorially to govern Midwest Title's

business activities in Illinois cannot be harmonized" with that decision.  Pl.'s Br. in Supp.

at 9.

<u>Dean Foods</u> involved a Wisconsin law that attempted to prohibit an Illinois milk

processor from paying price premiums to high-volume Wisconsin milk producers.  Prior

to the enactment of the Wisconsin law, the Illinois processor hired haulers to go to

Wisconsin, purchase Wisconsin milk, and transport the milk to Illinois for processing.

<u>Dean Foods</u>, 187 F.3d at 611-12.  When the law passed, the Illinois processor altered its

operations in an effort to avoid the law by requiring Wisconsin milk producers to

transport their own milk to Illinois, where the Illinois processor would agree to purchase

it and accept delivery.  <u>Id.</u>  Wisconsin attempted to enforce its new pricing regulations on

the transactions despite the Illinois' processors' attempts around it.  Dean Foods filed an

---

[4]Notably, a few commentators have questioned whether the Extraterritoriality Principle is appropriately considered an outgrowth of the Commerce Clause.  <u>See</u> Peter C. Felmly, Comment, *Beyond the Reach of States: The Dormant Commerce Clause, Extraterritorial Legislation, and the Concerns of Federalism*, 55 ME. L. REV. 467 (2003); Donald H. Regan, *Siamese Essays: (I) CTS Corp. v. Dynamics Corp. of America and Dormant Commerce Clause Doctrine; (II) Extraterritorial State Legislation*, 85 Mich. L. Rev. 1865 (1987).

action in federal court, arguing that Wisconsin's actions amounted to unconstitutional extraterritorial interference.

Even though Dean Foods maintained a sales office in Wisconsin, mailed business solicitations to Wisconsin customers, and had its representatives "enroll" Wisconsin producers in the new milk purchase program in Wisconsin, id. at 618-19, the Seventh Circuit nonetheless held that the actual milk sales took place wholly outside Wisconsin, no contracts were formed in Wisconsin, and no commitment bound the Illinois processor and Wisconsin producers before the milk was accepted in Illinois. Id. at 619. The Seventh Circuit concluded that mere contacts with another state are not enough to overcome the ban on extraterritorial legislation. Id. at 618-19. Rather, an element of the actual contract formation must occur within a state for that contract to come within the purview of the state's laws. Id. at 620.

The Dean Foods analysis focused particularly on the elements of contract formation in determining whether transactions occurred wholly within the state of Illinois. The court indicated that the crucial contacts are those which form a binding agreement: offer and acceptance of specific terms. Id. at 617, 619-20. If an offer occurs in one state and an acceptance in another, both states' laws may apply. Id. at 620. However, where the entire transaction occurs wholly within one state, only that state's laws may apply. Id. Advertising, and even preliminary negotiations in another state, are not enough to invoke that state's laws. Id. at 619.

11

Other courts have applied a similar analysis. The Fourth Circuit recently considered a case, Carolina Trucks & Equip. Inc. v. Volvo Trucks of N. Am., Inc., 492 F.3d 484 (4th Cir. 2007), where South Carolina sought to regulate transactions in which residents of South Carolina traveled to a Georgia dealership to purchase trucks. The offending Georgia dealership was listed in the Yellow Pages in South Carolina, advertised in regional trade publications, and mailed brochures to individuals in South Carolina. Id. at 487. All actual sales transactions, however, occurred on the dealership lot in Georgia. Id. The court held that advertising in South Carolina was insufficient to subject the challenged transactions to South Carolina law, stating that "[o]ne state may not 'project its legislation' into another." Id. at 489 (quoting Baldwin v. G.A.F. Seelig, Inc., 294 U.S. 511, 521 (1935)). The court explicitly rejected the argument that the transactions took place partially in South Carolina by virtue of the advertising solicitations sent there. Id. 490-91.[5]

Most recently, in Quick Payday Inc. v. Stork, 549 F.3d 1032 (10th Cir. 2008), the Tenth Circuit considered the application of a Kansas regulation on an out-of-state payday loan company who solicited business in Kansas via the internet. Quick Payday is of particular relevance to our case, because the Kansas Office of the State Bank Commission

---

[5]In the present case, Defendant alternatively argues that elements of the loan agreement are performed in Indiana because Indiana consumers may mail their payments from Indiana and have an ongoing relationship with Midwest Title. Def.'s Reply to Subm. at 5, 10-11 [Docket No. 55]. We find this argument unavailing. We doubt, for instance, the Fourth Circuit's analysis in Carolina Trucks would have substantially changed if South Carolina customers financed their truck purchases and mailed payments from their home state.

sought to apply the KUCCC based on a territorial application provision, KAN. STAT. ANN. § 16a-1-201(1)(b), which is remarkably similar to the Indiana provision at issue in our case.[6] The solicitation in question involved the lender web site, which could be accessed by Kansas residents in Kansas, as well as emails sent directly to prospective borrowers in Kansas.

In Quick Payday, Tenth Circuit adopted the view that "the borrower's physical location at the time of the solicitation is controlling."  549 F.3d at 1308.  The Defendant in our case vigorously maintains that this language indicates that the solicitation is part of a loan transaction, and that if a consumer is within Indiana when a solicitation resulting in a loan is received, the IUCCC applies.  Def.'s Reply to Subm. at 2.

In taking that position, Defendant misconstrues the Tenth Circuit's holding as it applies to the case at bar.  In Quick Payday, a prospective borrower could view the soliciting web page or email, and within a few electronic clicks enter into a loan agreement with the out-of-state lender, all while remaining at a computer terminal in Kansas.  549 F.3d at 1304.  Prospective borrowers *did not* need to travel to another state to get an offending loan; this is a distinguishing fact from the present case.  A close reading of Quick Payday reveals that both the Tenth Circuit and State of Kansas reflected this distinction, conceding that the advertisement alone did not trigger application of the

---

[6]KAN. STAT. ANN. § 16a-1-201(1)(b) states that the KUCCC applies if "the creditor induces the consumer who is a resident of this state to enter into the transaction by solicitation in this state by any means, including but not limited to: Mail, telephone, radio, television or any other electronic means."

13

Kansas statute.  Rather, the controlling factor was the location of the borrower when the loan was actually contracted for.  Id. at 1308.  The Kansas Office of the State Bank Commission specifically conceded that it would not attempt to apply the Kansas statute to situations where a Kansas consumer left Kansas to acquire a loan.  Id.[7]

In the present case, there is no doubt that Midwest Title solicited business in Indiana.  However, it is equally clear that no credit agreements were finalized within Indiana.[8]  All customers had to physically present themselves at a Midwest Title location in Illinois in order to enter into a binding loan agreement.  Just as a Yellow Pages advertisement would not create a loan agreement, it is spurious to argue that a loan has

---

[7]"[The Kansas Office of the State Bank Commission's] brief in this court further clarified . . . that '[t]he [KUCCC] regulates the conduct of Internet payday lenders who choose to make payday loans with Kansas consumers *while they are in Kansas*.' And referring to Quick Payday's hypothetical 'about a Kansas consumer leaving Kansas to acquire a payday loan' it declared that 'the OSBC would not try to apply the [KUCCC] to loans that occur under th[ose] circumstances.' We adopt this reasonable interpretation of the statute by those charged with its enforcement." Quick Payday, 549 F.3d at 1308 (emphasis in original) (internal citations omitted).

[8]Defendant at times seems to confuse a state's legislative reach with a state's judicial jurisdiction.  "Contacts" analysis certainly applies when considering the jurisdiction of a state's courts over a party or matter.  See International Shoe Co. v. Washington, 326 U.S. 310 (1945). There is no question that Midwest Title, by virtue of its contacts with the forum and activity injected into Indiana, would be subject to the jurisdiction of Indiana courts should a suit against it be filed there.  However, the reach of a court's jurisdiction does not determine the territorial bounds of a state legislature's laws (nor does it necessarily even determine the state law to be applied by the court).  A state is generally prohibited from asserting legislative power over parties and activities wholly beyond it's borders.  See Gerling Global Reinsurance Corp. of Am. v. Gallagher, 267 F.3d 1228, 126-37 (11th Cir. 2001) (explaining the similarities and distinctions between judicial and legislative jurisdiction, and holding that life insurance policies issued outside the state by out-of-state entities were not subject to Florida legislative regulation). Applying the Seventh Circuit's analysis in Dean Foods, the contacts in this case are insufficient to give Indiana legislative jurisdiction over the loan contracts in question.

not been transacted until a consumer mails in his payments from his home state.  In the

present case, no loan agreement came into existence until an Indiana customer traveled to

Illinois and obtained a loan at a Midwest Title store.  That transaction at that point was

completed and it clearly occurred within Illinois where loan documents were signed and

Midwest Title had tendered a loan payment in exchange for a promise to repay.[9]

Pursuant to established Seventh Circuit precedent, and consistent with conclusions

reached by other circuits, we hold that the loan transactions at issue in this case occurred

wholly within the state of Illinois.

B.  Invalidity of Extraterritorial Statutes:

The IDFT correctly argues that, even where a law is held to burden interstate

commerce, the Seventh Circuit applies the two-tiered analysis of Pike.  See Pike, 397

U.S. at 142; Def.'s Br. in Supp. at 15 (citing Alliant Energy Corp v. Bie, 336 F.3d 545,

546 (7th Cir. 2003)).  Pursuant to that test, a statute which facially or directly

discriminates against or regulates interstate commerce is subject to strict scrutiny.  Alliant

Energy, 336 F.3d at 546.  If a statute's effects on interstate commerce are only incidental,

_____

[9]Other cases Defendant cites are similarly distinguishable.  In each of the Aldens cases,
an Illinois mail-order company was required to comply with the consumer credit laws of other
states when its customers ordered merchandise on credit through the Aldens catalog.  See
Aldens, Inc. v. Ryan, 571 F.2d 1159 (10th Cir. 1978); Aldens, Inc. v. LaFollette, 552 F.2d 745
(7th Cir. 1977); Aldens, Inc. v. Packel, 524 F.2d 38 (3d Cir. 1975).  However, in each of these
cases, the customer was located in his or her home state when he or she ordered merchandise and
entered into the purchase contract.  Under the Dean Foods analysis, such transactions could not
be held to have occurred wholly outside the customer's state.

prohibition is commonly referred to as the Dormant Commerce Clause.  Intended to prevent economic protectionism, the Dormant Commerce Clause prohibits "regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors . . . Thus, state statutes that clearly discriminate against interstate commerce are routinely struck down . . . unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism . . . . " Id. at 273-74.

Laws motivated by simple economic protectionism are *per se* invalid. Philadelphia v. New Jersey, 437 U.S. 617, 624 (1978).  Under certain circumstances, however, a statute which merely burdens interstate commerce in the course of advancing a legitimate state interest may be upheld if the state interest outweighs the burden on interstate commerce.  Pike, 397 U.S. 137.

A.  The Extraterritoriality Principle:

States may also run afoul the Commerce Clause by seeking to regulate commerce which takes place "wholly" outside their own state.  Healy v. Beer Inst., 491 U.S. 324, 332 (1989) ("[A] state law that has the 'practical effect' of regulating commerce occurring wholly outside the state's borders is invalid under the Commerce Clause."); Dean Foods Co. v. Brancel, 187 F.3d 609, 614 (7th Cir. 1999) (stating that it is "a fact well known" that extraterritorial legislation is barred by the federal constitution); Nat'l Solid Waste Mgmt. Ass'n v. Meyer, 63 F.3d 652 (7th Cir. 1995) ("[T]he Commerce Clause constrains a state from projecting its economic legislation onto commerce wholly

or are direct but applied evenhandedly, the Pike balancing test balances the burden on interstate commerce against the state's legitimate policy concerns.  Id.  Alliant Energy rejected the premise that "precedent mandates the *per se* invalidation of *every* state regulation that has any extraterritorial effect whatsoever."  Id. at 546.[10]  In fact, several cases have specifically noted that, while economic protectionism is *per se* invalid, other motivations may trigger a balancing of interests.  See CTS Corp., 481 U.S. at 93 (rejecting the contention that Indiana has no interest in protecting its citizens from unfair business dealings); Alliant Energy, 336 F.3d at 549 (acknowledging that a state has an interest in protecting the welfare of its citizens); Morley-Murphy v. Zenith, 142 F.3d 373, 379 (7th Cir. 1998) ("[State courts] are well aware that the Supreme Court has held that *certain assertions* of extraterritorial jurisdiction violated the dormant Commerce Clause.") (emphasis added).  However, although the Supreme Court has held that certain extraterritorial *effects* of statutes are permissible, e.g., CTS, 481 U.S. at 93 (holding that a statute that regulated internal matters but had external effects was constitutionally valid), statutory provisions that specifically seek to regulate extraterritorial conduct are a different matter.  See Alliant Energy, 336 F.3d at 548-49 (indicating that a statute directly

---

[10]Initially, this statement appears to be in conflict with Supreme Court precedent.  In Edgar v. MITE, 457 U.S. 624 (1982), Justice White, writing for the Court, suggested that *all* extraterritorial regulation should be *per se* invalid.  The Seventh Circuit noted that "a majority of justices agreed that the two-tiered [Pike] test was the appropriate approach; however, they didn't agree on how the case before them fit that test.  Read in this light, the opinion suggests that extraterritorial regulations are subject to the traditional interstate commerce analysis."  Alliant Energy, 336 F.3d at 548; see also CTS Corp. v. Dynamics Corp. of Am., 481 U.S. 69, 81 (1987) (noting that "as the plurality in MITE did not represent the views of a majority of the Court, we are not bound by its reasoning").

regulating extraterritorial activity is unquestionably invalid, but applying <u>Pike</u> balancing to statutes with indirect effects on extraterritorial commerce).

The present case does not involve a statute which merely burdens interstate commerce or has extraterritorial *effects*. It concerns a statutory provision which, by design, directly regulates extraterritorial activity. Even according to Defendant's primary authority, <u>Alliant Energy</u>, such a statute is *per se* invalid. 336 F.3d at 548-49 (holding that "direct extraterritorial interference" or regulation is "unquestionably *per se* invalid," but reserving that a statute may be balanced against state interests where the statute "regulates internal matters and the regulations have external effects" or where the statute has "indirect effects on extraterritorial commerce"); <u>see also</u> <u>Healy</u>, 491 U.S. at 336 ("[A] statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid . . . ."); <u>Nat'l Solid Waste Mgmt. Ass'n</u>, 63 F.3d at 658-60 (indicating that a statute is invalid where it has the "practical effect" of controlling commerce wholly outside the state). <u>Cf.</u> <u>Ill. Rest Ass'n v. City of Chicago</u>, 492 F. Supp. 2d 981 (holding that despite a city ordinance's extraterritorial effects, it was valid because it was aimed at a sufficiently local problem).

A state may not directly regulate conduct or events beyond its own borders, no matter its motivation for doing so. <u>See</u> <u>Bigelow v. Virginia</u>, 421 U.S. 809, 824-25 (1975) ("A State does not acquire power or supervision over the internal affairs of another State merely because the welfare and health of its own citizens may be affected when they travel to that State.") Here, the territorial application provision, as interpreted by the

Defendant, purports to apply the IUCCC to consumer loan transaction occurring wholly within the state of Illinois.  Despite Defendant's attempt to paint the loan transactions as occurring partially in Indiana based on the reach of the solicitations issued to potential customers in this state, it is clear that the statute does not regulate the conduct of Midwest Title <u>within</u> the state of Indiana; it seeks to regulate Midwest Title's lending activities in Illinois.[11]

Were we to adopt the Defendant's view we would be giving the proverbial *carte blanche* to states to impose their diverse regulatory schemes on any commercial activity which affects any other state's interests and satisfies a rudimentary minimum contacts test.  Just as "citizens do not carry their home state's laws with them wherever they go," <u>Warriner v. Stanton</u>, 475 F.3d 497, 504 (3d Cir. 2007), state laws surely should not be permitted to travel wherever someone would have them go.

## III.  Permanent Injunction

When a permanent injunction is requested at summary judgment, a court must

---

[11]The Supreme Court also noted in <u>CTS Corp.</u> that statutes are routinely held invalid if they "adversely affect interstate commerce by subjecting activities to inconsistent regulations." 481 U.S. at 88; <u>see also</u> <u>Healy</u>, 491 U.S. at 336-37 (indicating that the Commerce Clause is designed to protect against "inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another state").  This problem is readily apparent in the present action.  Do the Plaintiff's title loans need to adhere to Indiana law, or Illinois law?  The Defendant argues that a loan made to an Indiana consumer must follow Indiana law, even if the loan is transacted in Illinois.  However, Illinois law indicates that a title lender in Illinois need only comply with the Illinois Consumer Installment Loan Act. 205 ILL. COMP. STAT. 670/9; ILL. ADMIN. CODE. tit. 38 §§ 110.320 to .430.

consider whether (1) the plaintiff has succeeded on the merits; (2) remedies at law, such as monetary damages, are inadequate to compensate for that harm; (3) an injunction is warranted after balancing the hardship to plaintiff against potential hardship to the defendant in granting the injunction; and (4) the public interest does not argue against granting the injunction.  Collins v. Hamilton, 349 F.3d 371 (7th Cir. 2003).  A violation of constitutional rights under the Commerce Clause constitutes an irreparable injury for the purposes of considering an injunction.  Kendall-Jackson Winery v. Branson, 82 F. Supp. 2d 844, 878 (N.D. Ill. 2000); Gov't Suppliers Consolidating Serv., Inc. v. Bayh, 734 F. Supp. 853, 864 (S.D. Ind. 1990).  In addition, Midwest Title's losses are not recoverable against the State because the 11th Amendment's doctrine of sovereign immunity bars suits for money damages against a state in federal court.  Wynn v. Southward, 251 F.3d 588, 592 (7th Cir. 2001).

Balancing harm to the parties and considering the public interest "largely overlap" when a Plaintiff sues a government entity to enjoin enforcement of a statute.  Prof'l Towing & Recovery Operators fo Ill. v. Box, 2008 U.S. Dist. LEXIS 100002, 45 (N.D. Ill. 2008).  While the public has an interest in enforcing laws that promote safety or welfare, the public has no cognizable interest in enforcing laws that are unconstitutional. See id. at 45-46.  Indeed, the public interest is best served by preventing unconstitutional enforcement.  Newsom v. Albemarle County Sch. Bd., 354 F.3d 249, 261 (4th Cir. 2003) ("Surely, upholding constitutional rights serves the public interest."); Preston v. Thompson, 589 F.2d 300, 303 n.3 (7th Cir. 1978) ("The existence of a continuing

constitutional violation constitutes proof of an irreparable harm, and its remedy certainly would serve the public interest.").

This court is not unsympathetic to Indiana's policy interests against the predatory lending practices seemingly prevalent in the consumer loan industry. The loan terms offered by Midwest Title appear to us to at least approach being abusive and unconscionable. However, it is the domain of Illinois to regulate its own consumer lending industry, as Indiana has the power and responsibility to regulate its own consumer lending industry. As far back as 1935, in <u>Baldwin v. G.A.F. Seelig, Inc.</u>, 294 U.S. 511 (1935), when New York attempted to project price regulation upon milk producers in Vermont to ensure an adequate supply of milk for New York citizens, despite the worthy social policy behind the regulation, the Supreme Court ruled: "One state may not put pressure of that sort upon others to reform their economic standards. If farmers or manufacturers in Vermont are abandoning farms or factories . . . the legislature of Vermont and not that of New York must supply the fitting remedy." <u>Id.</u> at 524. So it is, seventy-five years later, between Indiana's and Illinois's respective economic interests: each is limited to managing and regulating its own activities.

**IV. Conclusion:**

For the foregoing reasons, IND. CODE § 24-4.5-1-201(d) is hereby ruled unconstitutional as applied to Midwest Title to regulate title loans made wholly in the state of Illinois; and Midwest Title is entitled to a permanent injunction against IDFT's

application of the IUCCC to loans made wholly in the state of Illinois to Indiana residents.  Accordingly, Plaintiff's Motion for Summary Judgment is <u>GRANTED</u>, and Defendant's Motion for Summary Judgment is <u>DENIED</u>.  Final judgment shall be entered accordingly.

IT IS SO ORDERED.

Date: _____03/24/2009_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Gary W. Bippus
INDIANA STATE ATTORNEY GENERAL
gary.bippus@atg.in.gov

Stanley C. Fickle
BARNES & THORNBURG LLP
sfickle@btlaw.com

Paul L. Jefferson
BARNES & THORNBURG LLP
pjefferson@btlaw.com

John R. Maley
BARNES & THORNBURG
jmaley@btlaw.com

Alan S. Kaplinsky and Jeremy T. Rosenblum
Ballard Spahr Andrews & Ingersoll, LLP
1735 Market Street, 51st Floor, Philadelphia, PA 19103-7599